IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

FRED A. OSBORN,                          )    Civil No.: 3:10-CV-981-JE
                                         )
                    Plaintiff,           )    FINDINGS AND
                                         )    RECOMMENDATION
            v.                           )
                                         )
MICHAEL J. ASTRUE,                       )
Commissioner of Social Security,         )
                                         )
                    Defendant.           )
_____   )

        George J. Wall
        Law Offices of George J. Wall
        1336 E Burnside, Suite 130
        Portland, OR 97214

                Attorney for Plaintiff

        Dwight C. Holton, U.S. Attorney
        Adrian L. Brown, Asst. U.S. Attorney
        1000 S.W. 3rd Avenue, Suite 600
        Portland, OR 97204

Leisa A. Wolf
Special Asst. U.S. Attorney
Office of the General Counsel
Social Security Administration
701 5th Avenue, Suite 2900 M/S 221 A
Seattle, WA 98104-7075

       Attorneys for Defendants

JELDERKS, Magistrate Judge:

    Plaintiff Fred Osborn brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying his application for disability insurance benefits (DIB) under the Social Security Act (the Act). Plaintiff seeks an Order reversing the decision of the Commissioner and remanding the action to the Social Security Administration (the Agency) for an award of benefits.

    For the reasons set out below, the Commissioner's decision should be reversed and the action should be remanded for further proceedings.

## **Procedural Background**

    Plaintiff filed his application for benefits on April 23, 2007, alleging that he had been disabled since November 1, 1998.[1] After his application was denied initially and upon reconsideration, Plaintiff timely requested a hearing before an Administrative Law Judge (ALJ).

    A hearing was held before ALJ John J. Madden, Jr. on June 3, 2009 in Bend, Oregon. In a decision dated July 22, 2009, ALJ Madden found that Plaintiff was not disabled within the meaning of the Act. That decision became the final decision of the Commissioner on June 21,

---

[1] On June 11, 2009, after the hearing but before ALJ Madden's decision was issued, Plaintiff's counsel sent a letter to ALJ Madden seeking to supplement the record and offer additional argument. Plaintiff also sought to amend his alleged onset date to May 29, 1999 to conform with the existing medical record. In his written opinion, ALJ Madden did not refer to this change and used only the November 1, 1998 date. This court will, however, use Plaintiff's amended alleged onset date of May 29, 1999.

FINDINGS AND RECOMMENDATION – 2

2010, when the Appeals Council denied Plaintiff's request for review. In the present action, Plaintiff seeks review of that decision.

## Factual Background

Plaintiff was born on July 18, 1951 and was 51 years old on his date last insured. He has a GED and has past work experience as a delivery driver; septic, roof truss and tow truck driver, and firefighter caterer and catering truck driver.

## Disability Analysis

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520, 416.920. Below is a summary of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

Step One. The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA). A claimant engaged in such activity is not disabled.

If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two. 20 C.F.R. § 404.1520(b).

Step Two. The Commissioner determines whether the claimant has one or more severe impairments. A claimant who does not have such an impairment is not disabled. If the claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case under Step Three. 20 C.F.R. § 404.1520(c).

Step Three. Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the impairments listed in the SSA regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1. A claimant who has such an impairment is disabled. If the claimant's impairment does not meet

or equal one listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four.  20 C.F.R. § 404.1520(d).

Step Four.  The Commissioner determines whether the claimant is able to perform work he or she has done in the past.  A claimant who can perform past relevant work is not disabled. If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 C.F.R. § 404.1520(e).

Step Five.  The Commissioner determines whether the claimant is able to do any other work.  A claimant who cannot perform other work is disabled.  If the Commissioner finds that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates that a significant number of jobs exist in the national economy that the claimant can do, the claimant is not disabled.  If the Commissioner does not meet this burden, the claimant is disabled.  20 C.F.R. § 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the claimant.  Tackett, 180 F.3d at 1098.  At Step Five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy.  Id.

**Medical Record**

In his record of an office visit on July 20, 1999, Dr. Mark Belza noted that Plaintiff was being evaluated for left leg and low back pain and had last been seen in his office on June 15, 1995.  Dr. Belza's report indicates that Plaintiff underwent a lumbar microdiscectomy at L5-S1 in 1994 and "had done quite well" until May 29, 1999.  Plaintiff told Dr. Belza that on that date

he had "the sudden onset of left leg tingling and left low back and hip pain" and had taken

himself off work.  Plaintiff reported that he was taking approximately four Aleve per day "with

no relief in his pain."  In Dr. Belza's notes, Plaintiff described the pain as

> in an L4-5 distribution in the left lower extremity occasionally going to the dorsal
> surface of his left foot. His left hip bothers him the most, and his symptoms
> increase significantly with prolonged sitting. They are relieved with walking.  He
> has problems and increased pain with pressure when pushing on the clutch in his
> truck and driving with the gas pedal. Sitting in the car also exacerbates the
> numbness and tingling symptoms.

Dr. Belza's examination revealed that Plaintiff's range of motion of the lumbar spine was

within normal limits but that Plaintiff had "increased palpable paraspinal spasms in/about the

lumbar spine noted with rise from forward flexion with palpable tenderness . . ." and that internal

and external rotation of the left hip caused increased left hip pain

Dr. Belza diagnosed Plaintiff with lumbar disc disease and left lumbar radiculopathy,

recommended an MRI of the lumbar spine and prescribed Celebrex.

On July 23, 1999, Plaintiff underwent an MRI which revealed, among other things, both a

far right lateral protrusion of the L4-5 invertebral disc that contacted but did not obviously

displace or compress the right L4 root outside the foramen and a far left lateral protrusion of the

L3-4 invertebral disc which also contacted but did not obviously displace or compress the L3

root.

Plaintiff was seen by Dr. Belza on July 27, 1999 after his MRI.  Dr. Belza noted that the

scan demonstrated evidence of recurrent disc herniation along with other pathology.  Dr. Belza

reported that Plaintiff was "quite uncomfortable" and that Plaintiff said he had trouble riding

between Bend and La Pine without a "significant amount of left lumbar radiculopathy" although

he had very little in the way of low back pain.  Dr. Belza diagnosed Plaintiff with left lumbar

radiculopathy, recurrent lumbar herniated nucleus pulposus at L5-S1 on the left; discussed both

conservative and surgical treatment options with Plaintiff and released him to a sedentary/light duty position.

On October 18, 1999, Plaintiff underwent a microlumbar discectomy. In his presurgery visit and consultation report of October 14th, Dr. Belza noted that Plaintiff "has proven to fail continued conservative management since 07/1999. He has had unrelenting persistent pain."

One week post-procedure, Dr. Belza's notes reflected that Plaintiff continued to complain of persistent numbness and tingling in the anterior thigh.

Three weeks post-procedure, on November 12, 1999, Dr. Belza noted that Plaintiff had good strength in the lower extremities bilaterally and straight leg raising was negative but that Plaintiff reported there had been no change in his symptoms. Plaintiff complained of a stiff back and while he reported no pain, he described persistent numbness and tingling in the L5 distribution down the left lower extremity which bothered him when he walked any distance.

At a December 9, 1999 office visit, Plaintiff again reported stiffness in the back and numbness and tingling down the legs although his left lumbar radiculopathy symptoms "are improved." Dr. Belza ordered an axial loading myelogram.

On December 22, 1999, Plaintiff underwent a lumbar myelogram. The post-procedure radiology report of Dr. James Johnson noted findings of lumbar spondylosis at the L4-5 and L5-S1 levels; bulging discs at L3-4, L4-5 and L5-S1; slight underfilling of the left S1 nerve root; and bulge of the L4-5 disc with potential impingement upon the right L4 nerve root.

Plaintiff was again seen by Dr. Belza on December 28, 1999 during which the myelogram results were discussed. Dr. Belza noted that Plaintiff's symptoms continued unabated. Dr. Belza's examination revealed that Plaintiff's motor strength and sensory exam was normal but that straight leg raising was positive on the left hand side with sciatic notch

tightening and pressure.  Dr. Belza noted that he discussed various options with Plaintiff and recommended a far lateral foraminotomy at the L3-4 with exploration and possible discectomy.

In his record of an office visit on April 19, 2000, Dr. Belza noted that Plaintiff's symptoms remain unchanged, that he had reviewed the report of an Independent Medical Examiner (IME) who also felt that a lumbar microdiscectomy would be a "reasonable undertaking" and that Plaintiff could be released to a light duty position.

On October 3, 2000, Dr. Belza noted that Plaintiff had "limited range of motion of the low back secondary to low back pain" and that Plaintiff reported his pain was at about an 8 or 10 on a 10 pain scale with radiation of numbness and tingling in his left thigh.  Plaintiff also reported to Dr. Belza that his symptoms of numbness and tingling increased with walking and activity increased his low back pain.  Dr. Belza noted that the Plaintiff had good strength in the lower extremities; that his sensory exam was diminished and patchy over the left side portion of his left thigh and that straight leg raising "only elicits left-sided paraspinal muscle low back pain."

Dr. Belza also noted that his office was under the impression that surgery had been approved but that he had advised Plaintiff he would need to undergo a repeat MRI of the lumbar spine.  Dr. Belza noted "His symptoms have not changed in the last year, but his 3-level disease makes me concerned about progressive findings on the MRI scan . . . ."

Plaintiff was next seen by Dr. Belza on August 10, 2001.  Plaintiff reported that his symptoms had remain unchanged and described low back pain radiating into the lateral aspect of his left thigh that had continued unabated with symptoms remaining unchanged from October of 2000.  Dr. Belza noted that Plaintiff had good strength in the lower extremities with straight leg

raising tight to the left side compared to the right.  Dr. Belza recommended that Plaintiff undergo

a repeat MRI scan and released him to a light to medium duty position.

Plaintiff underwent an MRI on March 4, 2002.  The radiologist reported a far right lateral

protrusion of the L4-5 inverterbral disc and a far left lateral protrusion of the L3-4 disc.  Both

contacted but did not compress the nerve roots.  It was noted that findings of displacement of the

left L3 root outside the L3-4 foramen were similar to the MRI of July 23, 1999.

In the record of an office visit on March 27, 2002, Dr. Belza noted that Plaintiff's

physical examination was for the most part unchanged.  Plaintiff described his pain as 6 on a

good day to a 9 out of 10 by the end of the day.

Plaintiff was seen again by Dr. Belza on July 3, 2002 for a preoperative visit.  Notes

indicate that a nerve block was ordered to ascertain the exact source of Plaintiff's

symptomatology.

On July 23, 2002, Dr. David Stewart performed a left L3-4 transforminal epidural steroid

injection and selective nerve root block.  On August 5, 2002, Plaintiff was seen by Dr. Belza and

reported that the epidural injection had not helped him much.  Dr. Belza recommended a

myelogram and that procedure was performed on August 9, 2002.   In notes of a post-procedure

visit on August 12, 2002, Dr. Belza wrote that the results of the myelogram did not explain

Plaintiff's ongoing left lumbar radiculopathy and that he was sending Plaintiff to Dr. Stewart for

further evaluation and perhaps diagnostic testing.

On September 5, 2002, Dr. David Stewart evaluated Plaintiff on the referral of Dr. Belza.

Dr. Stewart noted that Plaintiff described "marked left posterior lower extremity discomfort

radiating to the mid-calf" and "low back pain."  Plaintiff also told Dr. Stewart that walking

increased his pain; that mild activity made his discomfort worse and that he was feeling the same

as he had for the three years prior.  Dr. Stewart noted that Plaintiff's gait was with left antalgia; his lumbar range of motion was 14 degrees of left lateral bending with the greatest pain in flexion and left lateral bending; straight leg raising was negative; deep tendon reflexes and muscle mass was symmetric.  Palpation of the spine and soft tissues revealed diffuse tenderness in the lumbar paraspinals.

Dr. Stewart further noted that Plaintiff exhibited a "significant degree of disease conviction," and that he was not interested in taking medications as he had not felt to benefit from them in the past.  Dr. Stewart made specific recommendations that Plaintiff increase his level of aerobic activity but was "not impressed . . . that he intends to follow through."  Dr. Stewart indicated that he thought it would be worth considering trials of medications for neuropathic pain.

On November 18, 2002, on a referral from Dr. Belza, Plaintiff was evaluated by Dr. Kent Yundt who recommended that Plaintiff undergo a six-week course of physical therapy.  Plaintiff attended nine out of eleven physical therapy sessions between December 2, 2002 and January 7, 2002.  His physical therapy progress report indicated that he had made no progress with therapy.  On the Patient Progress Survey, dated January 7, 2002, Plaintiff indicated that he could sit for two hours; stand for half an hour and walk for one hour without symptoms increasing; that he had difficulty walking; that driving made his symptoms worse and we was taking Tylenol for pain.  Although the Progress Survey is dated after Plaintiff's date last insured, it reflects treatment within the coverage period.

In July 2007, DDS consultant Dr. Neal Berner conducted a file review.  Dr. Berner opined that Plaintiff's alleged level of severity was not supported by his medical record "which

does not give an explanation for [Plaintiff's] subjective complaints." Dr. Berner emphasized what he characterized as Dr. Belza's numerous statements that Plaintiff was released to "work both at a light level as well as a medium level" and found Plaintiff's statements "partially credible." Dr. Berner determined that Plaintiff was capable of lifting 20 pounds occasionally and 10 pounds frequently, could stand and/or walk for about 6 hours in an 8 hour workday and sit about 6 hours in an 8 hour workday with unlimited restrictions on pushing or pulling. He also concluded that Plaintiff's only postural limitations were that he could engage in climbing ladders/ropes/scaffolds and kneeling only occasionally. Dr. Berner made no mention of any manipulative limitations.

On reconsideration, agency physician Dr. Martin Lahr reviewed Plaintiff's record and affirmed Dr. Berner's assessment.

In November 2007, medical consultant Dr. William Backlund completed a review of the previous RFC assessments and wrote "While this is a close call, I do not find any error in the DDS' rationale for the light exertional level given the numerous TSS's for light work and the variable exams."

Plaintiff was examined by Dr. Belza on April 27, 2009 and underwent a Physical Capacity Evaluation in May of 2009. While these exams took place after Plaintiff's date last insured, they were noted by the ALJ and are relevant to Plaintiff's argument regarding the weight given Dr. Belza's opinion and so will be discussed here. At the April 2009 exam, Dr. Belza noted that Plaintiff reported low back pain and tingling and numbness in the legs with symptoms described as ongoing, sharp, throbbing and aching with an intensity of 9 on a 10 scale. Plaintiff told Dr. Belza that walking and sitting aggravate his symptoms and that medication, injections and occupational therapy have helped for only a short time.

Dr. Belza noted that plaintiff hobbled around the room stiffly but that motor strength in the lower extremities was normal.  Range of motion in the cervical spine was full but was approximately 50% in the lumbar spine.  Dr. Belza opined that, "although not totally disabled," Plaintiff was "significantly impaired in terms of his ability to carry on a meaningful job."

A Physical Capacity Evaluation (PCE) completed by Physical Therapist Matt Kirchoff in May of 2009 reported that Plaintiff could be expected sit or stand four to six hours in an 8 hour workday but only for one hour at a time uninterrupted.  Kirchoff opined that Plaintiff could walk for two to four hours in an eight hour workday but only for 30 minutes at one time uninterrupted. Plaintiff demonstrated four out of five hip flexion strength bilaterally which Kirchoff noted was positive for increased low back pain.  The evaluation noted that Plaintiff was limited to lifting 17.5 pounds occasionally and 8.75 pounds frequently from floor to waist and 14 pounds occasionally and 7 pounds frequently from waist to eye-level.

In a letter written June 4, 2009 and submitted after the hearing but before the ALJ's decision, Dr. Belza provided an assessment of Plaintiff's condition.  Dr. Belza opined that the results of the May 2009 PCE were "valid."  He described Plaintiff's pain as chronic and severe and as precluding him from working a schedule that required him to attend eight hours per day, five days per week.  He opined that Plaintiff would miss work because of his condition more than two days in any given month.  Although Dr. Belza referred to his April 2009 chart note for a detailed description of Plaintiff's "current condition," he also wrote that Plaintiff's condition had not changed significantly since at least May of 1999 and his present restrictions "have been the same since that date."

**Hearing Testimony**

1. Plaintiff's Testimony

Plaintiff testified as follows at the hearing:

Plaintiff testified that he had completed the 10th grade and had a GED and a commercial driver's license.  He has not worked since 1999.  Before that he had been driving trucks since he was 18 years old but couldn't drive anymore because of back pain and numbness in his legs.  His pain has been constant for almost ten years.  Plaintiff testified that he could sit comfortably for about 30 minutes, could walk for about 30 minutes, couldn't stand in one place for very long, that his pain level was at an eight on a one to ten scale and he was taking up to three or four aspirin a day depending on his pain.  Plaintiff did not seek medical treatment between 2004 and 2009 because he did not have medical insurance.

Plaintiff injured his left hand in a motorcycle crash about 25 years ago.  The hand never healed properly and he is prevented from making a full grip.  Plaintiff demonstrated his left hand grip ability for the ALJ and the record reflects that he can bring his fingers to about a half-inch from his palm.

2. Testimony of Patricia Osborn

Plaintiff's wife, Patricia Osborn, testified at the hearing that Plaintiff can only sit about 30 minutes before he has to get up, he can walk for 10 to 20 minutes before he has to sit down and he can ride in the car about 30 minutes before he has to get out and stretch.  Plaintiff's second surgery did not help his condition at all.

3. Vocational Expert's Testimony

The ALJ posed a hypothetical describing an individual with Plaintiff's age, education and past relevant work experience.  The ALJ acknowledged that there were questions regarding

Plaintiff's reading limitations and thus instructed the Vocational Expert (VE) to consider the minimal or limited requirements of Plaintiff's past jobs that were categorized as including SVPs of 3 and 4. Using the assessment out of the file, the ALJ described someone who could perform a light range of work with limitations at 20 pounds occasionally, 10 pounds frequently; standing, walking about six hours in an eight-hour day; sitting about six hours in an eight-hour workday; pushing and pulling unlimited except by weights and all postural activities frequent except limited to occasional ladder, rope and scaffold climbing and kneeling. The ALJ added the manipulative limitations of grip strength in the left hand in the light range and preclusion of occupations that required frequent or continuous fine manipulation with the left, non-dominant, hand.

The VE testified that Plaintiff could not perform his past relevant work but could perform work as a security guard, meter reader or outside deliverer. The VE testified that while the Dictionary of Occupational Titles (DOT) lists the first two of these jobs as semi-skilled, recent Department of Labor publications described the work as unskilled because they could be learned in 30 days or less.

In response to questioning by Plaintiff's attorney, the VE testified that the labor market data he supplied was from 2007 or 2008 and that he did not have data from the period between 1998 and 2002. Plaintiff's attorney posed a hypothetical based on the PCE submitted from 2009 which limited standing to occasional, or up to one-third of the day. The VE testified that such a restriction would eliminate the meter reader and the outside deliverer occupations and would eliminate not all but most of the security guard positions.

**ALJ's Decision**

The ALJ determined that Plaintiff last met the insured status requirements of the Act on December 31, 2002.

At the first step of his disability analysis, the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date of November 1, 1998 through his date last insured of December 31, 2002.

At the second step, he found that Plaintiff's degenerative disc disease of the lumbar spine and a remote injury to his left hand were severe impairments.

At the third step, the ALJ found that through the date last insured these impairments, alone or in combination, did not meet or medically equal an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1.

The ALJ next assessed Plaintiff's residual functional capacity. He found that through the date last insured, Plaintiff retained the functional capacity required to perform light work as defined in 20 C.F.R. § 404.1567(b) except

> he can perform tasks that require no more than 6 hours each of sitting and walking/standing, with only occasional climbing of ladders/ropes/scaffolds and stooping, and which do not involve fine manipulation with the claimant's left hand.

In formulating this assessment, the ALJ found that the Plaintiff's medically determinable impairments could reasonably be expected to produce some of the alleged symptoms but that Plaintiff's statements concerning the "intensity, persistence and limiting effects" of his symptoms were not credible to the extent they were inconsistent with the RFC. The ALJ also noted that much of the evidence and testimony presented at the hearing involved the Plaintiff's then current severe pain symptoms and that the Plaintiff's medical records from before the date last insured did not support the Plaintiff's allegations of debilitating impairment.

FINDINGS AND RECOMMENDATION – 14

At the fourth step of his analysis, the ALJ found that Plaintiff could not perform any of his past relevant work.

At the fifth step, the ALJ noted that the testimony of the VE was inconsistent with the information contained in the Dictionary of Occupational Titles (DOT) but found it nevertheless reliable. The ALJ concluded that the Plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. Accordingly, he found that Plaintiff was not disabled within the meaning of the Act.

### Standard of Review

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The initial burden of proof rests upon the claimant to establish his or her disability. Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996). The Commissioner bears the burden of developing the record. DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews, 53 F.3d at 1039. The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir.

FINDINGS AND RECOMMENDATION – 15

1986).  The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation."  Andrews, 53 F.3d at 1039-40.

### Discussion

Plaintiff contends that the Appeals Council erred in failing to consider post-hearing evidence and that the ALJ erred in not giving controlling weight to the opinions of Plaintiff's treating physician, Dr. Belza; erred in finding that Plaintiff could perform duties with general education requirements which exceeded his actual abilities; erred in accepting the VE's explanation for why the SVP levels for the jobs listed are different from those provided by the DOT and erred in relying on labor market information regarding the availability of jobs from 2008 rather than the period in question.

I.  Failure to give controlling weight to the opinion of Plaintiff's treating physician

Plaintiff contends that the ALJ erred in not adopting the opinion of Plaintiff's treating physician, Dr. Belza, and in giving any weight to the opinions of the three non-examining physicians.

A.  Opinions of treating physicians

Because treating physicians have a greater opportunity to know and observe their patients, their opinions are given greater weight than the opinions of other physicians.  Rodriguez v. Bowen, 876 F.2d 759, 761-62 (9th Cir. 1989).  An ALJ must support the rejection of a treating physician's opinion with "'findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record.'"  Sprague v. Bowen, 812 F.2d 1226, 1230 (9th Cir. 1987) (quoting Murray v. Heckler, 722 F.2d 499, 502 (9th Cir. 1983)).   An ALJ must provide clear and convincing reasons for rejecting a treating physician's uncontroverted opinions.  Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).

If it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the case record, the opinion of a treating physician is given "controlling weight."  Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007) (quoting 20 C.F.R. § 404.1527(d)(2)).  If a treating physician's opinion is not "well-supported" or is inconsistent with other substantial evidence in the record, it is not given "controlling weight."  20 C.F.R. § 404.1527.  "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."  SSR 96-2p.  An ALJ need not accept a doctor's medical opinion that "is brief, conclusory, and inadequately supported by clinical findings." Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005) (citing Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001)).

B.  Analysis

Dr. Belza was Plaintiff's treating physician and surgeon and the medical record indicates he saw Plaintiff consistently between 1999 and 2004.  The ALJ determined that Plaintiff's medical record from before his date last insured did not support Plaintiff's allegations of debilitating impairment; that Dr. Belza's April 2009 assessment of Plaintiff was not inconsistent with the RFC set by the ALJ and that a letter submitted by Dr. Belza post-hearing was to be given little weight as it was "inconsistent with both the physician's medical findings from 2000 and 2001, as well as his April 2009 assessment finding that the claimant was "not totally disabled."

1.  Medical Record from Before Date Last Insured

The ALJ noted that Dr. Belza documented that Plaintiff complained of "occasional" low back pain but had "very little low back pain;" that after his October 1999 surgery, Plaintiff

reported his symptoms had improved; that Plaintiff demonstrated good strength in the lower extremities; was not working due to an unavailability of work and that Plaintiff was released to light to medium work.  The ALJ opined that such findings were not consistent with the disabling pain symptoms alleged by the Plaintiff at hearing.

What the medical record also reveals is that Plaintiff consistently complained of numbness, tingling and significant pain in his low back and lower extremities throughout the coverage period.  Medical scans and imaging consistently revealed problems in Plaintiff's L3-4, L4-5 and L5-S1 region of a severity that prompted Dr. Belza to make multiple recommendations of surgical intervention.  Plaintiff underwent a microlumbar discectomy and a nerve root block between July 1999 and December 2002 and the record reflects that yet another procedure would have been performed but for the lack of insurance approval.  Dr. Belza's diagnoses were mirrored in the reports of two additional treating physicians and his recommendation of a far lateral left L3-4 lumbar microdiscectomy was supported by the opinion of an IME.

Plaintiff argues that the ALJ's emphasis on the fact that at various times Dr. Belza released Plaintiff to light to medium duty is also misplaced because these releases were made in a worker's compensation context.  Plaintiff contends that a light to medium duty position for worker's compensation purposes does not equate to DOT definitions of light or medium work. Dr. Belza did specify light or medium *duty* in his treatment reports and I agree with Plaintiff's assertion that this should not be equated with light or medium work as defined by 20 CFR § 404.1567(b)-(c).

Plaintiff argues that the ALJ selected out-of-context statements by Drs. Stewart and Yundt to conclude that Plaintiff was exaggerating his pain.  Based upon my thorough review of the medical record and the ALJ's decision I agree.  Both physicians documented the findings

FINDINGS AND RECOMMENDATION – 18

referred to and relied upon by the ALJ.  However, Dr. Stewart also observed that Plaintiff walked with a limp, had a decreased range or motion in the lumbar spine and reported that contact with the L3 nerve root during the epidural steroid injection had created a significant reproduction of his symptoms.

The ALJ found it significant that Plaintiff did not avail himself of the conservative treatments suggested by Drs. Stewart and Yundt and drew the conclusion that because Plaintiff was not taking pain medication, his symptoms were not as severe as alleged.  The ALJ did not include that Plaintiff did, in fact, attend physical therapy after Dr. Yundt's referral; Plaintiff did indicate he was taking Tylenol for pain and expressed no interest in taking other pain medications because he did not feel they had helped him in the past.

2.  Dr. Belza's 2009 Evaluation and Letter

The ALJ noted that Dr. Belza's April 2009 assessment opined that Plaintiff was "not totally disabled" but was currently "significantly impaired."  After pointing out that an opinion as to whether Plaintiff was disabled was reserved for the Social Security Commissioner, the ALJ observed that Dr. Belza's opinion that Plaintiff was significantly impaired was not inconsistent with the RFC set by the ALJ's decision.

The ALJ did not explain how Dr. Belza's assessment, which noted that Plaintiff demonstrated a lumbar range of motion as 50 % of normal, "hobble[d] about the room stiffly," and described sharp, throbbing and aching symptoms at an intensity of 9 out of 10 aggravated by walking and sitting would be consistent with an RFC that required Plaintiff to perform light work with the limitations of no more than 6 hours each of sitting and walking/standing, and only occasional climbing of ladders/ropes/scaffolds and stooping.

In a June 4, 2009 letter, Dr. Belza concurred with the results of the May 2009 PCE, described Plaintiff's pain as chronic and severe.  He opined that Plaintiff's pain would preclude him from working a schedule that required him to attend eight hours per day, five days per week and anticipated that Plaintiff would miss work because of his condition more than two days in any given month.  Dr. Belza also wrote that Plaintiff's condition had not changed significantly since at least May of 1999 and his present restrictions had been the same since that date.

The ALJ characterized Dr. Belza's letter as a "revised assessment" of Plaintiff and gave it little weight, finding it to be inconsistent with the doctor's own earlier medical findings, specifically that the statements in the letter contradicted Dr. Belza's 2000 and 2001 releases of the claimant to light or medium work.  As discussed above, this comparison is flawed.

The opinions offered in contradiction of Dr. Belza's opinion were made by non-examining, non-treating consulting doctors.  The ALJ was required to provide specific and legitimate reasons, which were supported by substantial evidence in the medical record, for the rejection of Dr. Belza's opinion.  He did not do so.  Though the ALJ asserted that Dr. Belza's notes during the relevant time period did not support Plaintiff's allegations as to the severity of his symptoms, the medical record as a whole demonstrates otherwise.  Though he asserted that Dr. Belza's 2009 assessment of Plaintiff was not inconsistent with the RFC, the ALJ failed to specify why.  Finally, although he asserted that Dr. Belza's assessment of Plaintiff as described in his June 2009 letter merited little weight because it was inconsistent with the doctor's own earlier findings, the ALJ's reasoning was flawed and inadequate in light of the record as a whole.

When an ALJ provides inadequate reasons for rejecting the opinion of a treating or examining physician, that opinion is credited as a matter of law.  Lester, 81 F.2d at 834.  A reviewing court then has discretion to remand the action for further proceedings or for a finding

FINDINGS AND RECOMMENDATION – 20

of disability and an award of benefits.  See, e.g., Stone v. Heckler, 761 F.2d 530, 533 (9th Cir.

1985).  Whether an action is remanded for an award of benefits or for further proceedings

depends on the likely utility of additional proceedings.  Harman v. Apfel, 211 F.3d 1172, 1179

(9th Cir. 2000).  A reviewing court should credit the evidence and remand for a finding of

disability and an award of benefits if: 1) the ALJ failed to provide legally sufficient reasons for

rejecting the evidence; 2) there are no outstanding issues to be resolved before a determination of

disability can be made; and 3) it is clear from the record that the ALJ would be required to find

the claimant disabled if the evidence in question were credited.  Smolen v. Chater, 80 F.3d 1273,

1292 (9th Cir. 1996).

Here, the ALJ did not provide legally adequate reasons for rejecting the opinion of

Plaintiff's treating physician.  However, even if Dr. Belza's opinion is fully credited there remain

outstanding issues to be resolved.  The retroactive nature of Dr. Belza's assessment and the

assessment itself require additional inquiry into the severity of Plaintiff's condition during the

relevant period.  Dr. Belza's assessment of Plaintiff does not necessarily direct a finding of

disabled but it does direct, at the least, a re-evaluation of Plaintiff's RFC.  Additionally, if a

finding of disabled is not made initially but a re-evaluation determines that Plaintiff had the RFC

to perform a range of sedentary work then, according to the Medical-Vocational Guidelines,

transferability of jobs skills becomes material because of the Plaintiff's age and education. 20

CFR 404, Subpart P, Appendix 2, §§ 201.09-201.16.  Transferability of job skills was not

originally determined because it was immaterial to the disability determination under the ALJ's

RFC. Under these circumstances, the action should be remanded for further proceedings.

II. Failure of Appeals Council to consider post-hearing evidence

Plaintiff submitted supplemental evidence to the Appeals Council that included claimant's arguments, a 2009 report of reading, spelling and math tests administered to Plaintiff by a vocational expert and a verification of licensure by the Oregon Board of Medical Examiners of the reviewing physicians, Drs. Berner, Lahr and Backlund.  These materials were attached to Plaintiff's Memorandum in Support of his Petition for Review.  With leave of the Court, the Commissioner filed a supplement to the record on May 31, 2011 containing these documents.

Plaintiff argues that it was error that these materials were neither acknowledged by the Appeals Council in its Decision of June 21, 2010 nor returned to Plaintiff.  The Commissioner contends that under Harman v. Apfel, 211 F.3d 1172 (9th Cir. 2000) this court may consider the materials because they were first submitted to the Appeals Council but cannot award benefits based on evidence that the ALJ had no opportunity to evaluate.

Based on my review of the record, I do not believe that this court may properly consider these new materials because I do not find any evidence that they were, in fact, considered by the Appeals Council in denying Plaintiff's request for review.  The Harman court found that it could properly consider the additional materials before them because "the Appeals Council *addressed them* in the context of denying Appellant's request for review." Id. at 1180 (citing Ramirez v. Shalala, 8 F.3d 1449 (9th Cir. 1993)) (emphasis added).  Here, the record shows that in a letter dated October 1, 2009, the Appeals Council instructed Plaintiff that he had thirty days from the date of the letter to submit information and that if the council did not hear from Plaintiff within 30 days they would assume the Plaintiff did not want to send more information and they would proceed with their action based on the record they had.  The letter from Plaintiff's counsel to the

Appeals Council is dated November 25, 2009 as is the Certificate of Service attached.  This is well beyond the Appeals Council's 30-day deadline.

Further, there is nothing in the Appeals Council's denial that indicates that it considered the additional materials and, in fact, Plaintiff himself argues that the evidence was not considered.  This court may not properly consider evidence that has not had the benefit of review by either the ALJ or the Appeals Council.  The ALJ will have and should take the opportunity to consider this new evidence as part of the record if my recommendation that this action be remanded for further proceedings is adopted.

III. <u>ALJ's Education Findings</u>

Plaintiff contends that the ALJ erred in finding that he could perform jobs with education requirements that exceeded his tested abilities.  The ALJ found that Plaintiff had at least a high school education or GED.  The vocational hypothetical presented to the VE included this assumption.  Plaintiff argues that an Achievement Test administered by Certified Vocational Rehabilitation Counselor Steve Rau showed that the claimant could read at a sixth grade level, spell at a fourth grade level and perform arithmetic at the sixth grade level.  As discussed above, these tests were performed in August of 2009 and submitted to, although not considered by, the Appeals Council after the ALJ issued his decision.

The record that was before the ALJ and Plaintiff's own testimony confirm that Plaintiff had a General Education Diploma (GED).  The hearing transcript reflects that the ALJ was aware of "some questioning about some limitations on reading and so on" but considered the SVP levels of Plaintiff's prior work along with Plaintiff's GED and incorporated those qualifications into the hypothetical presented to the VE.  This was sufficient to support the ALJ's finding at the time that Plaintiff had at least a high school education or GED.

IV. <u>Error in Accepting Vocational Expert's Testimony</u>

As noted above, the VE testified during the hearing that the SVP levels he gave for two of the three occupations listed as jobs Plaintiff would be able to perform were different from those provided in the DOT.  Plaintiff argues that the ALJ erred in accepting the VE's explanation for this discrepancy.  I disagree.

In his decision, the ALJ noted the discrepancy and found that the VE credibly testified as to why there was a difference.  The ALJ found the VE's explanation to be reasonable.  He was, thus, entitled to rely on the information provided. SSR 00-4p ("The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information.")

Plaintiff also argues that the ALJ erred in relying on labor market information regarding the availability of jobs from 2008 rather than the period in question, 1999 to 2002.  The ALJ's opinion does not address this issue and the Commissioner makes no argument in regards to it.

The VE testified that his data was from the 2007/2008 time period.  When asked by Plaintiff's counsel whether he had any labor market data for 1998 to 2002, the VE, appearing to misunderstand the question, testified

> Unfortunately not because . . . the data . . . is usually 12 to 18 months behind.  So, I believe we're looking at June 2009 and that data would not be published usually until about a year to 18 months from now.

While the VE's testimony in response to counsel's question is confusing, the fact that the VE relied upon data that did not cover the relevant period is clear.   However, Plaintiff has offered and I have found no binding authority to support the contention that it was error to accept the later published job data nor does he offer any evidence that the data from 2002 would be substantially different from the 2007/2008 data.  The ALJ was entitled to rely on the testimony

FINDINGS AND RECOMMENDATION – 24

of the VE and take administrative notice of the job data provided from the cited publications.  20
CFR § 404.1566(d)-(e).  Information in those publications can be used to establish a rebuttable
presumption of the existence of jobs in the national economy.  <u>DeLoatche v. Heckler</u>, 715 F.2d
148, 151 (4th Cir. 1983).

On remand, application of labor market data from the relevant time period would be
appropriate.  However, I note that, if I did not recommend remanding the action for further
proceedings, I would have found that any error made by the ALJ in relying on the labor market
data supplied by the VE from 2007/2008 was harmless.  <u>See</u> <u>Curry v. Sullivan</u>, 925 F.2d 1127,
1131 (9th Cir. 1990) (error held harmless where finding was "immaterial" to the ALJ's
nondisability determination; a decision of the ALJ will not be reversed for errors that are
harmless).

## <u>Conclusion</u>

For the reasons set out above, the decision of the Commissioner should be reversed and a
judgment should be entered remanding this action for further proceedings. The judgment should
require that, on remand, the ALJ must fully consider and thoroughly address, all of Dr. Belza's
treatment records and opinions that refer to Plaintiff's condition during the relevant period,
including Dr. Belza's letter dated June 4, 2009; must either provide clear and convincing reasons
for discounting Dr. Belza's opinions or give them full credit and include in Plaintiff's RFC all
limitations that are consistent with his reports; and must consider the supplemental evidence
submitted to but not apparently reviewed by the Appeals Council.  If this reevaluation results in
an RFC that requires a finding as to transferability of skills, further proceedings needed to fully
address this issue shall be conducted.

**<u>Scheduling Order</u>**

This Findings and Recommendation will be referred to a district judge.  Objections, if any, are due February 13, 2012.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 25th day January, 2012.


 /s/ John Jelderks
John Jelderks
U.S. Magistrate Judge